I'm Judge Dennis, your panel today on this, this is the final case of the early RGWA. Today, Judge Belrod and Judge Costa and I are welcoming you to the 5th Circuit. And this case is, uh, Papalote Creek v. Lower Colorado River Attack. We'll hear first from Mr. Messions. Can I pass that mic? Yes, you did, Your Honor. Okay, you're first. Okay. According to what I have, you are the appellant? Yes, yes, Your Honor. Okay, proceed. Thank you, Your Honor. May it please the Court, Benjamin Messions on behalf of the appellant, Papalote Creek. LCRA asked the Court to rewrite Section 9.3 of the TPA, decreed in all encompassing limitation of liability, a provision to which Papalote never agreed and would not. The Court should reverse for three reasons. First, there is no agreement. The plain text of Section 9.3 does not confer a $60 million limitation of liability provision on LCRA, a possibility the parties never discussed. Second, LCRA is not entitled to rewrite Section 9.3. LCRA represented throughout the proceedings that it mistakenly used the word damages instead of liability to describe what the provision is limiting. That's the heart of the matter, Mr. Messions. So let's talk about that. Let's say I'm the CEO of a big company. I wish, right? But I'm the CEO, and I call up my general counsel, and I say, boy, remember when we got sued last year in that terrible lawsuit? Remind me what our damages ended up being. And the general counsel says, oh, yeah, that was a bad one. Our damages were $50 million. You're saying that conversation is not an ordinary plain usage of damages, and we're using it to refer to what a defendant had to pay? What I'm saying is that this in context is not. And let me give you a couple of reasons for that. First of all, the dictionary definition, the Black's Law dictionary definition, the accepted deficient cases of ordinary meaning of damages is exactly how we describe it. But second, perhaps more importantly here, is that is the meaning of the word damages used throughout the entire agreement. The word damages is used 30 times. The word liability is used some 15 or 18 more. And each and every time the contract uses those terms, except according to Elteria in this provision, damages means exactly how we would take it to mean. Well, let's say I know what the dictionary says, and I understand it's money paid to a plaintiff. But it still seems to me that you can then look at it from either perspective of the transaction. I mean, take the word rent. Rent is money that is paid to a landlord. But I would think you could say, the tenant could say, oh, I better come up with some money. My rent's due Friday. And the landlord can say, oh, I can't wait until Friday. I've got to collect rent. Isn't damages like rent where either side can consider it to be theirs? I don't believe damages is like rent. Rent, I believe, has the ability to have a shifting meaning, depending on what side of the transaction you're on. But I don't believe damages. And that is reflected in the established dictionary definition. The fact of the matter is, Elteria could not identify a single example where a corpse or a dictionary interpreted to mean anything else. And here, I think it's particularly problematic for them because of the first sentence of Section 9.3. Let me say that. This is the last time I'm going to bother you. Then I'll let you go for a while. I promise. You know, they cite a handful of cases using the term defendant's damages. And you try to distinguish those and move it back and forth. I went on Westlaw in an alt state and an alt feds, and there are over 2,000 uses of defendant's, apostrophe s, damages. So, again, how can that show it's just beyond the common usage to refer to a defendant's damages? Well, again, the way I would answer the question here, I think the court can answer the question here, is you don't need to scour Westlaw to determine the meaning of damages like Elteria has done. But I appreciate the point you're making and why we want to do it. But I just think you stick to the contract. So you're relying on context more than plain meaning, it sounds like. We're relying on both, Your Honor. But I think the context really favors us, and I think we're in a better position. Plus the fact here, turning back to the second point I was going to make, Your Honor, is that here Elteria said they erred. That's what they told the arbitrator the first time around. That was in their papers. And when you have in a situation of an error, Texas law provides a mechanism, and that is reformation, something they did not take advantage of. And the third point that we're going to make today is that Elteria's arguments really, they want, I think, the court to think we're talking about competing interpretations. But they are contract modification masquerading as interpretation. They are in conflict with the plain language, context, and structure. And let me begin first with the point that the parties did not agree to a limitation of liability provision. And intent is the key. Multiple data points confirm the requisite intent is completely absent. We have plain language that we just talked about. We have the text that says Elteria's, I'm sorry, buyer's damages, and it does not accomplish, that language does not accomplish the stated intent. It does not confer a limitation of liability. It makes no sense and is openly inoperative. As I mentioned, Elteria, in its attempts to secure a favorable arbitration award, told the arbitrator that this is a mistake, this is an error, and that it did not make sense as written. And the text is the only objective evidence of the party's intent. I'd also note there's not any other evidence of an intent to agree to a limitation of liability. The parties never, not one time, discussed a limitation of liability provision for Elteria, and Papaloza never would have agreed to it anyway. This absence of intent is fatal here, and that's because Elteria cannot satisfy its burden. And we cite cases, Your Honors, that indicate that it is Elteria's burden to establish the existence of an enforceable liability limitation. And it bears that burden, and because it cannot show, based on the objective evidence the language of the contract gets there, it cannot enforce this provision. So what happens? I'm not going to ask you about damages again, but let me ask you about likewise. How do you deal with the word likewise, which to me means mutuality? You know, we just discussed the limitation of damages for that side of the transaction, and now likewise there's a corresponding limitation for the other side. Do you just say the whole sentence was a mistake? Well, Elteria says the sentence is a mistake. Our position is it does not accomplish the stated intent. And as to the use of the word likewise, as we know in our brief, there's certainly another way to rewrite the provision, such that it refers to Elteria's damages for seller's failure to comply with the agreement. That is certainly plausible, given that Elteria, the focus of the negotiation was on Papalote's cap. It was on Papalote's parent's guarantee and the protection it sought there. So essentially what I'm saying, Your Honor, you can rewrite the provision, not like Elteria does, but in a way that would confer a corresponding damages cap so that Elteria could not go beyond the limitation of liability, for example, to go upstream and secure in excess of $60 million from Papalote's parent company, Eon. And since that was the focus of the negotiation, it makes perfect sense. But again, we think the analysis here, you have to focus on the language. That is the objective evidence of intent. You are saying the clause should be, you say, inoperative, which means we should say that that sentence has no effect whatsoever. That's exactly our point, Your Honor. It has no effect. There's no meeting of the mind. There's no agreement to impose a limitation of liability provision. And that is the end of the story. Wouldn't you agree that rather than reading a sentence that these sophisticated parties negotiated to make it completely inoperative, if there is any plausible alternative on which a fair reading is supportable, we should give it that reading? I don't believe that's the right way to handle the situation here because those rules of inoperability, of sophistication, they are contract construction issues. And our position here is that what they have to do to get there, to get to the reading... What intent is to lay aside your view in the contract against surplusage? Right. I don't... Sorry. I'm not sure he's always right, but it seems that... It would make an awful big piece of surplus of this contract if we didn't give it some meaning. And I understand the point you're making about the reading provision, but those rules apply, in our view, when they're interpreted... You have to start with the languages written, and if you have to have a language, if you have to put a condition on the word damage, which every reading the health area offers requires a different word. It requires liability for damages. It requires a literal substitution of the word liability for damages. It requires damages that pathology might... I'm sorry, health area might pose to pathology. So we're not talking about just a purely interpretive endeavor here. We're absolutely talking about a situation where there has to be a condition imposed, new language, and that is all reformation, modification, my guy has interpreted. That's where it seems to come back to my first question, which is if it's not absurd, maybe it's not the best usage, but if it's not absurd for me as the CEO to say, oh, there are damages in the case, you know, the defendant's damages, if that's not crazy or absurd, and that gives the sentence meaning, don't we have to follow that at least plausible interpretation of the sentence? Again, I would say two points about that. That could only be the case if that were the only and obvious reading of the provision, and it is not. We do not believe it is. It's the only reading that doesn't render it inoperative. I don't believe so, because there's another way of reading what the parties were talking about here, and I mentioned it in conjunction with the likewise claim, which is that as an additional way of precluding a claim of damages in excess of $60 million, and again, what we're asking the court to do is read the term damages so that it has the same meaning it has in every other part of the contract. But then don't you run into the problem that it's about the breach, LCRA's breach? You're saying you want to read it as another limit on LCRA's damages, but it's saying for its breach, so that would make no sense. Well, I understand what you're saying about the its breach, but let me just say you still have the problem, then you have to radically change the meaning of the first part of the sentence. As I mentioned, Papalozzi would not have agreed. You have to change what damages means. It's something, it's a liability, and Papalozzi, simply put, never would have agreed. If the language had been, buy it as an aggregate liability, there's no way they would agree to that. Why? Because the importance of this contract was its long-term nature. Counsel, can you win anyway, even if you lose on Judge Costa's question about damages? Can you win anyway? Because they didn't have a right to terminate the contract, and their interpretation renders 9.4 superfluous. We were just talking about rendering it. This is a whole section of the contract that would be rendered superfluous. So can you still win even if you get hung up on the sentence that you've been dealing with for some time in your argument? Yes, Your Honor. I think we can also win based on 9.4, because that provision says that when there's an exclusive remedy provision and a limitation of liability, it must be expressed in the provision in which that limitation of liability is provided, and that would be in section 4.3, and there's no other limitation there. We absolutely can. We can also win, as you mentioned, under the termination theory of the case, because if you leave the provision the way Elseary wants to, then that means that they have a right to terminate that the innocent party controls on the case. It gives them the ability on day one to complete and subvert the economic purpose of this agreement. They can walk away on day one with $60 million, which is just a fraction of the overall investment. That makes no sense in terms of the purpose, but it also makes no sense in terms of Article 6, because the ability to terminate the contract in this case lands with half a vote there, and that is because we are the innocent party. Counsel, on the issue of termination, what is the timetable of when they gave notice of their intent to try to terminate, regardless of whether they could? Right. So to be clear, they never expressly stated they were going to terminate the agreement, but what they told us in October 2016, the month before the first of three oral arguments in this case, is that they were no longer going to take power, and then subsequent to that, they began counting towards what they perceived to be the $60 million cap, and they stopped making those payments during the summer of last year in advance of the hearing. So the answer is... If they stop making their payments, then you can take the election to terminate if you wish, but otherwise you can sue them for not making their payments, can't you? That is exactly our position, JoJo. We absolutely can do that. Because that's what they have to do. They either have to pay or they have to take, and they're not taking and they're not paying, so you can choose to terminate or you can choose to sue them for their failure to pay. That's exactly how we're reaching contact and how Article VI fits very neatly with Section 9.3. We would absolutely agree with that, Your Honor. And let me just, before, in the final minute I have, I want to talk a little bit more about the reformation argument we've made, and that is, this has probably been addressed, but I think it's an incredibly important point. When you concede there's a mistake, as they said, the way the law, Texas law is really clear, provides a pathway to deal with this particular problem, and what it is is reformation. But they didn't prove it, and I think that was a tactical decision on their part. Is there a case that says what happens when someone, when they change their position, they pivot from, oh, it's a mistake, to, oh, it's not a mistake, and in fact it's the hinge point by which we limit our liability in a huge manner? Right. Well, Your Honor, we do not invoke principles of estoppel here, because they just don't fit quite right to be perfectly candid with the court. But because we had enough... They can't do that, can't they? Yes. I think it's possible to shift positions on a legal matter, but as a factual matter, they said they made a mistake. That's what they told the arbitrator. They said it was a successful award. It looks like, I'm sorry, that we respect the request of the district court's decision. You have five minutes, everybody. Thank you, Your Honor. Thank you. Mr. Botkin? Thank you, Your Honor. May it please the court. Ryan Botkin for the Lower Colorado River Authority. The last sentence of Section 9.3 has to mean something. It is not an option for this court to conclude that it is meaningless and should be disregarded. Apollote has come up with creative arguments, but at no point in the trial court or here has it articulated a coherent meaning that gives effect to that provision. Instead, its explicit argument is that the last sentence of Section 9.3 should be disregarded altogether. We disagree. Do you agree that previously, not you personally, but that your client took the position that it actually didn't mean anything in the past? No, Your Honor. I don't believe we've ever taken that position. What position did you take before the arbitrator, your client? Well, Apollote has pointed to the word mistake, but we've never taken the legal position that there was a mistake in this contract. We have always contended that the plain language of Section 9.3 can be interpreted in only one way, and that is to mean that the buyer's damages for failure to perform its material obligations is limited in the aggregate at $60 million. You never took the position that there was a mistake in the language of the likewise sentence? We use the word mistake in connection with a discussion of some of the negotiations and the word choices they made, but we've never made that a legal position, no, Your Honor. Is there anything in the documents which you've told us to consider and you told the district court to consider that would take the position that you had a $60 million or that it was intended between the parties that you should have a limitation of liability in addition to a take or pay? Absolutely, Your Honor. Where was that discussed? Well, first of all, I want to be clear that in an unambiguous contract, we look to the plain language of the agreement, and as a matter of initial matter, we contend that the plain language supports a cap in favor of LCRA. In addition to that, under the surrounding circumstances rules, we submitted the red lines to the district court, which reflect that the initial draft was a one-sided unilateral cap in which it was entitled Limitation on Sellers' Damages for Certain Types of Failures. After some negotiation, the LCRA added language that read, the current language that read, Sellers' Damages was then followed by a discussion of the four enumerated situations in which the sellers' liability would be limited, in which the sellers' damages would be limited to $60 million. LCRA then added language that buyers' damages, prepared to perform its material obligations, would likewise be limited in the aggregate at $60 million. There is no question that these parties both discussed and agreed to a bilateral damages cap, and Papalote's assertion to the contrary is frankly untrue. If there had been no termination, how would this provision apply? Well, Your Honor, it applies to all failures to perform material obligations. That encompasses both liquidated damages payments and a termination payment. The two provisions are phrased differently, and the cap on LCRA's damages applied to failures to perform material obligations. That encompasses both of the 4.3 and 6.3 obligations. How much did it cost them to build this? I don't have that number off the top of my head. Much more than $60 million, though, right? Indeed, and they still have that wind farm and are selling power from it. What do you do with 9.4, which says that these exclusions and modifications must be in the same provision, so they would need to be in 4.3? Well, it's important to initially acknowledge that the PPA in this case was negotiated between sophisticated parties, and for all of its big numbers, the commercial bargain is fairly simple. Papalote builds this wind farm and sells its output at the contract price. LCRA then agrees to purchase and receive that output over the contract term and pay the contract price. The parties also agreed in advance how to handle the consequences if either party failed to perform the material obligations. That's where we have the liquidated damages payments in Article 4 and the termination payments under Article 6. They also placed the general remedy provisions in Article 9, and what that does is show that the parties developed a framework, a scheme with multiple provisions that would work together in concert. Now, Papalote argues that the exclusive remedy provisions in 9.4 prohibit the application of the cap in 9.3. Under the rules of construction, we are to harmonize all provisions so that all are given effect and none are rendered meaningless. Our construction is that Section 9.3 applies notwithstanding anything to the contrary, and under that construct, we're done. But let's look at 9.4, which is their argument. What does 9.4 do? 9.4 is titled Waiver and Exclusion of Other Remedies. The first thing to point out is a numerical cap is not a remedy, it's a cap. In Section 9.4, the parties confirm that they intend the express and exclusive remedies set out on the PPA to be the only available remedies for breach of the PPA, and the parties are waiving all other remedies, such as an injunction or a specific performance. They also waive other measures of damages, so the parties can't recover restitution damages or reliance, consequential damages, punitive damages, and the objective of 9.4 is to keep the available remedies and measures of damages within the PPA. Now, Papalote points to Obligor's liability shall be limited as set forth in such provision to prohibit the application of the cap in 9.3. There are three problems with that argument. First is that it nullifies the cap. Our rules of construction obligate us to look at the plain language, harmonize all provisions, so that each is given effect and none are rendered inoperable. In fact, their construction is the opposite of the plain language, which reads, Buyers damages for fair performance material obligations. They say it's not limited in the aggregate to $60 million. Second, it's not compelled by the plain text of 9.4. There's nothing in 9.4 or 4.3 that's liquidated damage provision, which expressly overrides 9.3. What that does... 4.3 is the key. The 4.3 is what specifically deals with this issue, about what happens when you don't take or buy power. Right, Your Honor. And when you don't pay, pay the penalty for not buying, whether it's penalty of damages, and I'm not getting into that right now. And so it would need to be in that provision. 9.4 says that 4.3 is the specific provision that governs that relationship. And so any modification of that would need to be in 4.3 because of the language of 9.4. Your Honor, respectfully, I disagree, because that language itself is not in either 4.3 or 9.4. 9.4 points to 4.3 to set limitations. So it's excluding other types of remedies and other types of measures of damages. But it doesn't say that 4.3 is the sole limitation on such damages. I think we can take some... We can read meaning into the difference between the first and second sentences of the second paragraph of Section 9.4. The second sentence of that paragraph, we've been talking about the first, in which the parties say, if there is an express remedy set forth in the contract, then that's the remedy that you get, and that's the measure of damages that you get. The second sentence reads, if no remedy or measure of damages is expressly provided... Sorry, it reads... If no remedy or measure of damages is expressly provided herein, the obligor's liability shall be limited to direct damages only. So if direct damages is a type of damage, so that indicates an intent that we're looking at types of damages. So we're trying to exclude types of remedies, specific performance or injunction, and types of damages, such as restitution or consequential damages and that sort of thing. The purpose of 9.4 would be thwarted by an interpretation which indicated that it was trying to exclude more than that, and in fact, the purpose of the provisions of 9.4 is not to exclude the remedy provisions of the PPA. In fact, its purpose is to establish the validity of those remedies, not used to nullify part of the remedial scheme. I'd submit that the text of 9.3 also helps us answer that question. Under 9.3, damages shall be limited in the aggregate to $60 million. There's only one place in the PPA where it might be necessary to aggregate damages payments, and that's with the liquidated damages provision. The termination payment is a one-time payment. Second, Section 9.3, the damages caps apply, notwithstanding anything to the contrary in this agreement. That's an indication of contractual intent that those caps have primacy, and it solves any theoretical conflict with the other provisions. We are harmonizing all the provisions. We find meaning in the word likewise in that respect. So the text in 9.3 says, shall likewise be limited, and remember, we give meaning to all the provisions, so what does likewise do for us in that context? There are really only two realistic choices. It could simply mean also, or it could serve the purpose of incorporating the clause, notwithstanding anything to the contrary in this agreement. So the two caps are treated in a likewise fashion. Does your interpretation mean that unilaterally, your client could, as soon as they reach the $60 million amount for the pay, that unilaterally can terminate the contract? To be precise, Your Honor. And that there's no penalty, and that the 18-year provision is just not used. There's no real 18-year provision for this duration of this agreement. Is it 18 or 16? I think it's 18. It's 18. There's no 18-year provision, because once you hit 60, you're stopping paying under the take of pay. That's exactly right, Your Honor. I want to be precise about the termination, though. It's unilateral on your part. It's not because they terminate you. It's because you decide you're terminating unilaterally, even when they don't want you to terminate. Well, that's what I was going to say. The LRA does not have the power to terminate. Certainly, they've notified Papalote that they would stop purchasing and receiving power and paying the contract price. And it's left to Papalote to make the election whether they want to continue receiving the liquidated damages payments under that calculus, that formula, or to declare a termination and receive damages under that formula. But in either respect, the damages are capped at $60 million for a failure to perform material obligations, which this is. I'd like to address real quick the Papalote... There's no way to make them keep... There's no way for them to make you keep taking or paying. That's right, Your Honor. The injunctive relief is foreclosed. It's a unilateral contract on the take or pay from the beginning. Your Honor, it's not a take or pay contract. The Lord knows we've got plenty of... I know the Papalote one. I'm quite familiar. But that's what it is. It's a factual matter. It could choose to pay the rate, which I know is not the market rate right now, or hasn't been. Or it could choose to pay the penalty. And that's not really true because if it reaches the cap, then you can just walk away. Well, the walk away is correct. Respectfully, I disagree that this is a take or pay agreement. We have plenty of examples of actual take or pay agreements from the natural gas context and other places. This is not written as a take or pay contract. We have material obligations to purchase and receive and pay the contract price. There is no alternate performance provided for in the PPA itself. With respect to Papalote's second issue on appeal, its position is that it is entitled to an additional $60 million in liquidated damages. This gets close to the issue, Judge Elrod, that you were just talking about. It's our position that this result is foreclosed by the plain language of the agreement. Section 9.3, again, provides that damages for failure to perform material obligations are limited in the aggregate to $60 million. Damages from whatever source and under whatever calculation shall have a numerical limit of $60 million. And any other interpretation would render inoperable that provision that caps the aggregate damages. The analysis can and should stop there. Papalote's argument is directly contrary to this unambiguous text of the PPA. Papalote takes the position that payment of damages is performance. The text of the PPA indicates otherwise. Section 4.3 is headed liquidated damages due to buyer's failure to take, and it's framed as an exclusive remedy. But a remedy only comes into play when a party fails to perform material obligations. The remedy is not itself a material obligation. This court indicated such in the last opinion, Judge Elrod, that you authored where it described the 4.3 payments as damages, in fact. Our view is we said that material obligations for purposes of the cap in the context of this cap are those which result in damages in the event of a failure to perform. Those are the Article 3 obligations, 3.1 to purchase and receive power and 3.3 to pay the contract price. We also contend that Papalote had judicially stopped from asserting the clearly contrary position that it took in the last appeal, in which the court relied. And candidly, we are on opposite sides, but the court agreed with the Papalote position and not the LCRA position. And it was not a mistake. That rule protects the integrity of the judicial system and obligates them to not change their mind. I'd like to follow up on Judge Costa's scenario, in which she's the CEO. Imagine this scenario. You're a negotiator for a public utility. You get a draft PPA from the seller, and it's entitled, Limitation on Seller's Damages for Certain Types of Failures, and then goes on to list the four scenarios in which the seller would pay damages for those failures. And so you say, well, what about me? What about the buyer's damages? That's when LCRA inserts the provision reading, okay, buyer's damages for failure to perform its material obligations is likewise limited to $60 million. That language was added to this PPA. Papalote agreed to it. This is a contract, and we are not here to try to bail out Papalote from the deal that it struck with LCRA. The business context arguments that Papalote seems to enjoy so much start to sound a lot like fairness arguments, in which they regret the bargain they struck and simply want to get out of it. I would submit that, well, there's a whole bunch of cases from the Texas Supreme Court, even recently, the Barrow-Shaver case that comes up in the context of extrinsic evidence, that itself was a, on the facts, seemed like an unfair result. But the Texas Supreme Court has been very clear that the courts are not to be employed to bail the parties out of deals that they regret after the fact. We are obligated to look to the plain language of the agreement, give it its ordinary meaning in the context in which it arises, and give meaning to all the provisions and harmonize all the provisions so that all are given effect and none are rendered inoperable. And we contend that that's what we're doing here. Your Honor, I'll conclude. We respectfully submit that the plain language of the PPA answers the questions before this court. In a situation where LCRA has failed to perform its material obligations under the agreement, the PPA dictates that the damages resulting from those failures are limited in the aggregate to $60 million. We respectfully ask this court to affirm the judgment of the district court. Thank you. Thank you, sir. That concludes. I think there's a rebuttal from Mr. Thank you. I appreciate it. Rebuttal first. The LCRA conceded there was a mistake in the prior proceedings. I pointed the court to page 161 of the record on appeal. They specifically say damages was mistakenly used. They say the damage is clearly erroneous. They say, quote, the use of damages in section 9.3 second sentence makes no sense. So absolutely. That was conceded away. The second point I would make is Mr. Bodkin's argument about extrinsic evidence. It's simply do not work because not anything. Mr. Bodkin pointed to indicate to the party ever, ever discussed the limitation of liability provision between the parties. In fact, if you look at record seven, page seven 20, it's an email that says a lot about half of these cap on, on its liability. There's not one reference to an LCRA cap on liability. And the bottom line was never a meeting in mind. The language of the contract confirms. Third, I want to briefly talk about the interrelationship between the various contractual provisions. There was a lot of discussion about termination, right? But one thing we heard for sure from Mr. Bodkin, it's LCRA's position that they could walk the contract in day one or pennies on the dollar. That was not the deal. The parties agreed to that's why the termination provisions in article six are essential to understanding this case and essential to evaluating what, where the rights really landed. It also happens to confirm the points we were making before about the intent of the parties, because there is no scenario, no scenario at all. The pathology would have agreed to limit, uh, LCRA's, uh, liability to $60 million when it was agreed to hundreds of millions of dollars on the brand new bill to super power plant at LCRA specification. It does not make sense. And that's again, the language confirms that also there's the relationship between 9.4 and 4.3. These two provisions are talking to one another. 4.3 is the provision that identifies exclusive remedy. 9.4 does two things. Mr. Bodkin says it confirms the validity of, of a limitation of liability or exclusive remedy provisions. Absolutely true. Remember 9.4 only references the, the, the seller's aggregate liability, not the buyers. And it specifically says that the provision, anything providing exclusive remedy must be housed in that exclusive remedy provision. And judge Elrod, you absolutely agree that 4.3 is where this case is. The final point I'd like to make are the arguments Mr. Botkin addressed about the relationship between, uh, what happens if the court were to accept LCRA's interpretation of, of the second sentence of 9.3. Our position is this, even if the court agrees with LCRA in order for the provision to be triggered, there has to be or kick, kick in and be triggered. Two things have to happen. There has to be a failure of material obligations. The left plane, which is obligation. There's two of them is taking and paying for the power. The other is three provision. Only when those are, are, do not occur. Does the, does the language in the second sense of 9.3 kick in Mr. Botkin refers the court to their argument, both aggregate, but that, that puts the issue backwards. You must first decide, rethink what it means to failure to fail to perform material obligations. And only at that point is the provision in both. And then I would like to conclude with a word about what happened in the prior. And I don't, and with your honor, judge Elrod on this panel, I know you know what you wrote. And so I don't want to belabor the point that the holding of the court was of course focused on section 9.3, not 4.3, but the court held. And our reading opinion is this, is that it held the 9.3. Is a, uh, what was an issue with a, an interpretation dispute referred to section 9.3. Is it damaged this provision? It did not report all the section 4.3. I think our position is entirely consistent, but LCR is slipping here because they won the initial order to compel arbitration based on the position. It's both that by paying damages under 4.3, they were not in breach of the agreement. They were fully compliant with the agreement. The way this provision works, the $60 million cap that LCR claims exists only begins to run when both these provisions are revoked. And for that reason, the court should reverse the district court's opinion on both of these grounds. And we very much appreciate the court's time. Thank you. Thank you, sir. Thank you, counsel. The case is submitted. And that brings, I hope I'm not mistaken. To the end of our arguments today.